DREYFUS et al. v. HEDGER TRANSP. CO.

THE PEARL HARBOR.
THE R. LENAHAN.

THE HARVESTER.
THE GILBERT W. BENEDICT.

District Court, S. D. New York.
July 21, 1932.

Otto & Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for libelants.

Single & Single, of New York City (George B. Warburton, of New York City, of counsel), for claimant Richard J. Foster.

William F. Purdy, of New York City (Edmund F. Lamb and John E. Purdy, both of New York City, of counsel), for Hedger Transportation Co., W. E. Hedger Co., and Pearl Harbor, Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for L & L Canal Line, Inc.

FRANK J. COLEMAN, District Judge.

On August 25, 1928, the barge Harvester, en route from Buffalo to New York, struck a cement wall at a spillway of the canal on the south side of the Sixty Mile Level, causing such injury to her lower corner that she shortly thereafter sank, with considerable damage to her cargo of grain. She was the first in a tow of four heavily loaded barges in tandem, and the barge Gilbert W. Benedict was the third in line. The tug Pearl Har-

bor had them on two 75-foot hawsers, and the barges were close hauled to each other. The means for steering the tow was provided by a wheel on the bow of the second in line which could accomplish a kinking movement between the first and second barges. At the time of the impact the tug R. Lenahan was passing westwardly with a tow of six barges arranged two abreast in three tiers. The numerous and diverse allegations of fault on the part of the various interests involved can be more clearly disposed of seriatim.

█ 1. The barge Harvester as a separate unit was clearly without fault. She in herself was seaworthy and powerless to prevent the accident. She was entirely under the control of the tug Pearl Harbor and the kinking device on the second barge, and her master had no part in the movement.

█ 2. The barge Gilbert W. Benedict, which was the third in line, was similarly guiltless. The only ground upon which she is charged with fault is that her master was on duty at the steering wheel on the second barge when the accident occurred, and that his negligence contributed to it. He, however, was not acting as master of the Benedict at the time, but was an agent or employee of the tug Pearl Harbor or of the carrier, performing a function for the entire tow. It is alleged that he not only was negligent in the performance of this task, but was so incompetent as to have made the Benedict unseaworthy. From my personal observation of him and from all the evidence I believe that he was not generally incapable of doing that steering; but, even if he were, it would not have made the Benedict unseaworthy, because unquestionably he was adequate to his duties as master of that barge. Even though it was generally understood that the masters of the various barges in such a tow would take their turn at the steering of the entire fleet, negligence or incapacity in the performance of that duty cannot be charged in rem against the respective barge.

█ 3. As to tug R. Lenahan, I find that neither she nor any part of her tow physically forced the Harvester into contact with the wall. The overwhelming weight of the evidence is to the effect that the Harvester was accidentally and unnecessarily steered or pulled into the wall in an endeavor to avoid the Lenahan's tow. It is charged, however, that the Lenahan was at fault in giving rise to the danger, and this is based upon the two separate grounds: (a) That she did not slow down or stop to the east of the spillway until

after the Pearl Harbor and her tow had passed it; and (b) that, if she had the right to pass at the spillway, she did not arrange and maneuver her tow sufficiently close to the north side of the canal that the Pearl Harbor's tow had space enough to pass the spillway in safety.

Without reciting the details of the construction of the canal at that point and the widths and draughts of the tows, it must suffice to state my finding that there was room enough for them to pass in safety at the spillway if due diligence had been used by both. Considering only the various dimensions, the two tows might have passed with a distance of 15 or 20 feet between them. The wall which the Harvester struck did not project into the channel, but was flush with the southerly bank of the canal. The Harvester hit it because her starboard bow corner was permitted to move beyond the normal line of the canal and to project very slightly into the spillway's recess or basin adjacent to the wall.

As to the Lenahan's obligation to stop east of the spillway so as to permit the Pearl Harbor's tow to pass it in safety, I find that, while the spillway did slightly increase the dangers of navigation, it was not sufficient to require such procedure. During a period of seventeen years, there never has been any other accident at that point, and all that was necessary to avoid such an occurrence was to keep the barge within the main body of the canal. When the tows were 2,000 feet distant from each other, the Lenahan blew a passing signal of one blast, which was accepted by the Pearl Harbor without any indication of danger. The light and visibility at the time were entirely satisfactory, and the wind was so light as to be negligible. Under all the circumstances, I conclude that in the exercise of due diligence the master of the Lenahan was not bound to foresee that his failure to stop would cause the accident.

█ As to the adequacy of the measures taken by the Lenahan to keep her tow close to the north bank, it appears that the barges were all close hauled to each other with a total width of 42 or 43 feet and a total length of about 400 feet. They were on two short hawsers of about 15 feet, and no rudders or steering devices had been provided. They drew only 2 feet, and therefore did not necessarily extend out from the bank as far as the middle line of the channel. They were proceeding at the rate of about one-half mile

an hour against the current, which was flowing at about three-quarters of a mile an hour.

From all the conflicting evidence, I find that the Lenahan kept her tow well to the north side of the channel. The head of the tow was close up to the bank, though the tail may have swung off to midchannel. There was some rubbing of the two tows, and the Pearl Harbor breasted off the light barges in the customary manner. It is impossible from the very contradictory testimony to find with satisfactory certitude the exact courses followed by the tows and the exact distances between them, but I am satisfied that the Lenahan did the normal and ordinary things in the arrangement and navigation of her tow. She did not use the highest degree of care, but did use ordinary diligence. Under all the circumstances, I conclude that the Lenahan was not at fault.

4. The real cause of the accident was negligence on the part of the tug Pearl Harbor and of the man operating the steering device on the second barge in line. Unquestionably the latter, in an endeavor to avoid the Lenahan's tow, steered the Harvester too far to starboard. Having headed her in that direction, he dogged his wheel and ran across the steering barge to ascertain how far the Harvester was from the wall. About one-half a minute elapsed before he released the wheel and started to steer the Harvester to port. This maneuver had carried the Harvester only a few inches into the spillway basin, but it was sufficient to cause the damage. It was entirely unnecessary for the barge to be put so far over in order to pass the Lenahan's tow, because, even if there were rubbing of the tows, that was a very ordinary occurrence. The tug Pearl Harbor might have prevented the accident by releasing the port hawser in time, which would have had the effect of pulling the bow of the Harvester out toward the center of the channel. The Pearl Harbor did attempt this when it was too late, and I believe that the delay was due to lack of diligence.

5. The Hedger Transportation Company was not only the charterer of the tug and of each of the barges, but was the carrier who contracted with the libelant cargo owner under a produce exchange form of contract. This rendered the Harter Act (46 USCA §§ 190–195) inapplicable [Dreyfus v. Marine Transit Corp. (C. C. A.) 49 F.(2d) 215], and the company is liable.

Settle decree in accordance with above findings and rulings.